UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

YRIS MATEO f/k/a YRIS SANTOS

                           Case No.: _____

                   Plaintiff,

       -against-

MEL S. HARRIS AND ASSOCIATES, LLC
PINPOINT TECHNOLOGIES, LLC
MEL S. HARRIS
KERRY H. LUTZ
DAVID WALDMAN
TODD FABACHER

                 Defendants.

------------------------------------------------------------------X

## ORIGINAL COMPLAINT

Plaintiff Yris Mateo f/k/a Yris Santos ("Ms. Santos") was sued in state court by the Defendants, a putative assignee creditor and its debt collection attorneys, for a putative debt that she did not owe. In efforts to collect the putative debt which Ms. Santos never owed, the Defendants procured a default judgment against Ms. Santos via "sewer service", using a notorious process server known to complete false affidavits of service. Further, Defendants used an affidavit of merit to enter default judgment that falsely stated the affiant had "personal knowledge" that Ms. Santos owed the putative debt. Furthermore, despite knowing that the default judgment against Ms. Santos was obtained via "sewer service" and a false affidavit of merit, Defendants restrained Ms. Santos' bank account; made false and misleading statements to Ms. Santos in an attempt to induce her to pay; and opposed Ms. Santos' legal efforts to vacate the default judgment entered against her; and to this day Defendants will not release Ms. Santos' money unless she releases Defendants from liability for their abusive debt collection practices. Based on this and other conduct, Plaintiff brings this action for Defendants' violations of the Fair

1

Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, New York General Business Law § 349 *et seq.*, New York Judiciary Law § 487 *et seq.*, and for the tort of conversion, and in support alleges as follows.

## A.   JURISDICTION AND VENUE

1.      The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Jurisdiction of the Court arises under 28 U.S.C. § 1331 in that this dispute involves predominant issues of federal law under the FDCPA. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.  The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

2.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Bronx County, New York.

## B.   PARTIES

3.      Plaintiff Yris Mateo f/k/a Yris Santos (hereinafter Plaintiff or "Ms. Santos") is an individual currently residing in Bronx County, New York. Plaintiff changed her name from Santos to Mateo when she married in 2002.  However, since the debt collection litigation beginning in 2005 that forms the basis of this federal suit used the name Santos, this complaint will reference Plaintiff by the name Santos.

4.      Defendant MEL S. HARRIS AND ASSOCIATES, LLC (MSH) is a limited liability corporation organized under the laws of the State of New York, with its principal place of business

at 5 Hanover Square, 8th Floor, New York, NY 10004. MSH is a debt collection law firm.

5.     Defendant KERRY H. LUTZ is an attorney who was a member and partner at MSH during the period of the filing and entry of the sewer service default judgment against Ms. Santos, and for a number of years thereafter.

6.     Defendant DAVID WALDMAN is an attorney, and is a member and partner at MSH. Waldman is a resident of the State of New York. He may be served at his residence at 4 Olympia Ln. Monsey, New York 10952, or wherever he may be found.

7.     Defendant TODD FABACHER is an attorney, and is a member and partner at MSH. Fabacher is a resident of the State of New York. He may be served at his residence at 447 W. 18th Street, Apt. 7E, New York, New York 10011, or wherever he may be found.

8.     Defendant PINPOINT TECHNOLOGIES, LLC is a limited liability corporation organized under the laws of the State of New York, with its principal place of business at 64 Beaver Street, Suite 322, New York, New York 10004.

9.     Defendant MEL S. HARRIS is an attorney who is the primary member and lead partner at MSH ever since the inception of the firm.

## C.  STATEMENT OF FACTS

10.    Defendant Pinpoint Technologies, LLC (hereinafter "Pinpoint") is a debt collector that purchases charge off consumer debts for pennies on the dollar and files lawsuits to collect those alleged debts. Pinpoint has filed thousands of collection lawsuits in New York.

11.    Defendant Mel S. Harris And Associates, LLC (hereinafter "MSH") is a debt collection law firm that files tens of thousands of collection suits in the names of its clients, in addition to sending out hundreds of thousands of collection letters and making hundreds of thousands of

collection phone calls.

12.     On or about September 21, 2005, Pinpoint, through its debt collection law firm MSH, filed a collection lawsuit in Bronx Civil Court against now-Plaintiff Santos.  The suit was styled *Pinpoint Technologies, LLC v. Yris Santos*, Index No. CV-049791-05/BX (the "collection lawsuit"). The complaint was signed by Mel S. Harris ("Harris").  *See* Exh A.

13.     The collection lawsuit sought to collect a putative debt where the original alleged creditor was Citibank. Ms. Santos has never had a credit card account with Citibank.[1]

14.     Defendants in the case at bar engaged in the same fraudulent activity to get a default judgment against Ms. Santos as they have against over a hundred thousand other New York residents. The Second Circuit recently upheld certification in a class action alleging the Defendants in the case at bar[2] and others used false SAMSERV affidavits of service and false Fabacher affidavits of merit as part of a criminal conspiracy to fraudulently obtain debt judgments *en masse*:

> In this case, four plaintiffs allege that a debt-buying company [Leucadia], a law firm [MSH], a process service company [SAMSERV], and others engaged in a scheme to fraudulently obtain default judgments against them and more than 100,000 other consumers in state court. Defendants allegedly acted in concert to defraud these consumers in violation of [the FDCPA, RICO, GBL 348, and Judiciary Law 487]. Plaintiffs… move for class certification.

---

1 If there was a credit card account with Citibank in her name then it would have been the result of identity theft. At some point between 2002 and 2003, Ms. Santos' identification and Social Security number were stolen from her workplace. She knows that at least one account was fraudulently opened by an identity thief using her information. The same identity thief also engaged in check fraud of up to $10,000.

2 In *Sykes* the debt buyers in whose name the collection lawsuits were brought was an organization named Leucadia, rather than Pinpoint.  However, the limited information available to date suggests the relationship of Pinpoint to MSH is similar to that of the Leucadia defendants in *Sykes*.  Almost all of the collection lawsuits filed in the name of Pinpoint are filed by MSH, based on a review of the collection lawsuits filed by Pinpoint in New York City in 2005, the year of the suit against Ms. Santos. Michael Young a "member" of Pinpoint was recently denied an attempt to mass-file assignment notices of Pinpoint judgments in cases filed by MSH. *In re Pinpoint Technologies, LLC*, 45 Misc. 3d 1223(A), 5 N.Y.S.3d 329 (N.Y. Civ. Ct. 2014)("Michael Young [has] signed all of the notices as a "member" of both Pinpoint and Pinpoint Too. Because a Michael Young is a notary on a number of documents submitted by Mel S. Harris in the initial litigation, the court must question exactly what is Michael Young's status.") Mr. Young is the president of MSH, and a *Sykes* Defendant.  In the underlying case against Ms. Santos, as in *Sykes*, Mr. Fabacher, a MSH attorney, signed an affidavit on behalf of Pinpoint falsely stating that he has "personal knowledge" of the facts of the putative accounts..

The motion is granted. The record before the Court establishes that defendants obtained tens of thousands of default judgments in consumer debt actions, based on thousands of affidavits attesting to the merits of the action that were generated *en masse* by sophisticated computer programs and signed by a law firm employee [Fabacher] who did not read the vast majority of them and claimed to, but apparently did not, have personal knowledge of the facts to which he was attesting. The record also shows that on hundreds of occasions the defendant process servers [including Benjamin Lamb] purported to serve process at two or more locations at the same time. As discussed more fully below, defendants' unitary course of conduct purportedly to obtain default judgments in a fraudulent manner presents common questions of law and fact that can be resolved most efficiently on a class-wide basis.

*Sykes v. Mel Harris & Associates, LLC*, 285 F.R.D. 279, 282-83 (S.D.N.Y. 2012) ("*Sykes II*") aff'd sub nom. Sykes v. Mel S. Harris & Associates LLC, 780 F.3d 70 (2d Cir. 2015) ("*Sykes III*")

15.     Defendants Harris, Lutz, Waldman, and Fabacher were among the MSH principals named personally in *Sykes* as part of a RICO criminal conspiracy.

16.     In the case at bar, SAMSERV was the process serving company and Benjamin Lamb was the individual process server.

17.     In the *Sykes* case, plaintiffs' expert Nicholas Egleson executed a declaration on July 31, 2011 based on his analysis of the SAMSERV database of service of process for MSH from 2007-2011. *See* Exh. B. The Egleson declaration was specifically relied upon by the district court as a basis of its "findings of fact" supporting the contention of widespread sewer service for MSH by SAMSERV, including specifically by Benjamin Lamb.

I make the following findings of fact based upon the depositions, declarations, and exhibits submitted by the parties in connection with this motion [for class certification]….

Between January 2007 and January 2011, Samserv defendants performed service of process in 94,123 cases filed by Mel Harris in New York City Civil Court, 59,959 of which were filed on behalf of Leucadia defendants. (7/31/11 Egleson Decl. ¶¶ 2–4). Records maintained by defendants reveal hundreds of instances of the same process server executing service at two or more locations at the same time. (*Id.* ¶¶ 9–11, Ex. A). On 517 occasions, defendants Mosquera, Lamb, and Andino, alone, claimed to be have performed service in two or more places at the same time. (*Id.* ¶ 11, Ex. A). For example,

Mosquera claimed to have performed service at four different locations at 1 p.m. on September 17, 2008. (*Id.* ¶ 10). Lamb claimed to have performed service at two different locations at 6:59 p.m. on November 28, 2007. (*Id.*). Andino claimed to have performed service at nine different locations at 4 p.m. on March 29, 2007. (*Id.*). There were also many other occasions where multiple services were purportedly made so close in time that it would have been impossible for the process server to travel from one location to the other as claimed. (*Id.* ¶¶ 13–23, Ex. B).

These facts, together with the high number of default judgments obtained by defendants, provide substantial support for plaintiffs' assertion that defendants regularly engaged in sewer service.

*Sykes II* at 283, 284.

18.    In the case at bar, Lamb stated (falsely) that on September 29, 2005 he served Ms. Santos at 2124 Bogart Ave, Bronx, NY. Lamb stated that he delivered the summons and complaint on a "Mr. John," a person of suitable age and discretion, who indicated that the address was Ms. Santos' actual place of residence.  *See* Exh C. These statements are false. Ms. Santos has not resided at Bogart Ave. address since 1998, seven years prior to the alleged service.

19.    In the case at bar, Defendant Todd Fabacher executed a false affidavit of merit. Fabacher attested (falsely) that he had "personal knowledge" of the key facts necessary for the default judgment against Ms. Santos. This included "personal knowledge" that Ms. Santos executed a Retail Charge Agreement with Citibank; that Ms. Santos incurred charges by using the account, that account statements were issued to Ms. Santos; that the amount due was $967.05; and that Citibank assigned all rights to the account to Pinpoint.

20.    In fact, Fabacher had no knowledge of any of the facts for which he alleges personal knowledge, facts that are necessary to obtain a default judgment.  *Sykes v. Mel Harris & Associates, LLC*, 757 F. Supp. 2d 413, 420 (S.D.N.Y. 2010) ("*Sykes I*") ("Fabacher, signed the vast majority of the approximately 40,000 affidavits of merit they filed each year. Fabacher averred to having personal knowledge of the key facts establishing that the debt in each

collection action was due and owing. Assuming 260 business days a year, Fabacher had to have personally (and purportedly knowledgeably) issued an average of twenty affidavits of merit per hour, i.e., one every three minutes, over a continuous eight-hour day."); *Sykes II* at 285 ("Hence, Fabacher signs hundreds of affidavits a week, purportedly based on personal knowledge, purporting to certify that the action has merit, without actually having reviewed any credit agreements, promissory notes, or underlying documents, and, indeed, without even reading what he was signing.")

21.     The Lamb false affidavit of service (Exh C) and the Fabacher false affidavit of merit (Exh D) are two key documents allowing Defendants to obtain default judgment against Ms. Santos.

22.     On November 16, 2005, Defendant Kerry L. Lutz, a partner at MSH, used the false affidavits of service and merit, to file an application for default judgment. *See* Exh E.  In the application for default judgment, Lutz falsely "affirms under penalty of perjury that service of the summons and complaint has been made."  Default judgment was rendered on November 23, 2005 against Yris Santos for $1,102.38. *Id*.

23.     Nearly ten years later, Defendant David Waldman, a partner at MSH, signed an "Execution with Notice to Garnishee" dated October 20, 2014. This was an affirmative step to execute upon a known fraudulent default judgment.

24.     By October 20, 2014, MSH and Waldman (a named defendant in Sykes), actually knew of the July 31, 2011 Eglson declaration. As previously noted, the Egleson declaration was a key piece of evidence relied upon in the district court's findings of fact in support of its 2012 order granting class certification. *Sykes II* at 284.

25.     In signing the October 20, 2014 Execution and serving it on Chase, Ms. Santos' bank, Waldman knew and intended for the document to be delivered to Ms. Santos. Mr. Waldman's signature on the October 20, 2014 Execution implied that Mr. Waldman had done a meaningful review of the facts and circumstances of Ms. Santos' file. However, any meaningful review of Ms. Santos' file would disclose to Waldman the fraudulent nature of the default judgment. Any meaningful review of the Ms. Santos' file would have disclosed the affidavit of merit which Fabacher falsely stated he had "personal knowledge" of the key facts that allowed the entry of default judgment. Any meaningful review of the Ms. Santos' file would have disclosed that the affidavit of service was executed by SAMSERV and Lamb. The affidavit of service should, at the very least, have prompted Waldman to look further into the validity of service, by, for example, checking MSH's service database to see the other locations Mr. Lamb contended to be on the day of putative service as to Ms. Santos. On information and belief, Waldman and MSH made no such investigation.  The signing and issuing of the October 20, 2014 Execution to Chase, knowing and intending it to be forwarded to Santos, represented the validity of the judgment, when Waldman knew or, with a meaningful attorney review of Santos' file, should have known, the judgment was invalid. Under these circumstances, the issuance of the October 20 Execution is itself conduct that itself is unconscionable, false, deceptive, and misleading.

26.     As Defendants were involved in the fraudulent conduct that resulted in the default judgment, Defendants' restraint on Ms. Santos' bank account constitutes conversion at the outset, as does the subsequent removal and retention of Ms. Santos' money from the bank account.

27.     Ms. Santos did not know, nor did she have any reason to believe, a suit by Pinpoint was started, much less that a judgment was entered, until October or November, 2014, when

Defendants took steps to execute on Ms. Santos' Chase bank account, Chase provided Ms. Santos with a copy of the restraint of her account, and Ms. Santos' sister provided her a document regarding the judgment that the sister had received.

28.     Shortly after learning of the default judgment and restraint on her bank account, Ms. Santos called MSH to find out why her bank account was restrained and what could be done to release the account.

29.     The bank had restrained $2,172.82 of Ms. Santos' account, and taken a $75.00 "processing fee" for itself.

30.     A MSH employee told Ms. Santos that she would not be able to access *any* of the money in her accounts until she signed a release to authorize the bank to release the restrained accounts.

31.     This was a false statement made by MSH in attempt to intimidate and deceive Ms. Santos into signing a release. At the time of the MSH statement to Ms. Santos, MSH knew by way of a prior information subpoena that Ms. Santos had over $11,500.23 in her savings account.[3] Therefore, MSH knew that even if the hold on $2,172.82 was not released, Ms. Santos would still have unfettered access to over $9,000 of her money in her savings account. But MSH attempted to deceive Ms. Santos into believing that she would not be able to access any of the money in her account unless she signed the release. This statement is separate conduct and communications that are unconscionable, as well as false, deceptive, and misleading.

---

3 MSH disclosed in subsequent filings in the collection lawsuit that on October 6, 2014, Chase signed a response to an information subpoena from MSH that Ms. Santos had $11,500.23 in a savings account and $1,437.23 in a checking account jointly held with another person. The information subpoena appears to be undated, and the date of issuance is unknown. No notice of the subpoena was provided to Ms. Santos. The information was signed by Harris for MSH, and on behalf of Pinpoint.  It is a separate unconscionable act for Harris to invade Ms. Santos' privacy by issuing an information subpoena to her bank for similar reasons that it was unconscionable for Waldman to issue the October 20, 2014 execution. Any meaningful review of Ms. Santos' file would preclude Harris from issuing an information subpoena on the default judgment given the clear indicia of fraud in the rendering of the default judgment.

32.     On information and belief, the release that MSH wanted Ms. Santos to sign was the same or substantially similar to a standard form release MSH seeks to have consumers sign to release restrained funds.  *See* Exh F.  By signing the release the consumer would "acknowledge the debt." Ms. Santos did not owe the Citibank account debt that she was sued upon, so to have her sign an acknowledgement of that debt as a condition of releasing her account was false, deceptive, and misleading, and unconscionable. The release of funds would also release the bank from any legal claims related to the release, and, indeed, would require Ms. Santos to indemnify the bank.

33.     On or about October 29, 2014, NYC Marshal Ronald Moses issued a "Levy and Final Demand" restraining Ms. Santos' Chase account, seeking $2,172.82, inclusive of fees, interest and costs.

34.     On or about November 13, 2014, Ms. Santos filed a *pro se* Order to Show Cause ("OSC"), seeking to vacate the default judgment obtained in the collections lawsuit.

35.     Finding merit to the application, Hon. Joseph E. Capella signed the order to show cause, stayed all collection activity, and set a hearing for December 1, 2014.

36.     In Ms. Santos' affidavit of support of her OSC, she stated that she was never served and does not owe the amount.

37.     However, at the time of her original *pro se* OSC in November 13, 2014, Ms. Santos (a native Spanish speaker) filed using the court's "do it yourself" program in English. Ms. Santos does not read English very well. Moreover, when Ms. Santos filed the November 13, 2014 she also did not have access to her court file, nor did she have access to any information about the putative service of process.  Archived court files sometimes take months to be retrieved from storage, and that was the case with Ms. Santos' file.

38.     Rather than stipulating to vacate the fraudulent default judgment and release the restraint on Ms. Santos' account, MSH and Pinpoint decided to vigorously oppose Ms. Santos' OSC and sought to retain the benefit of the default judgment.

39.     On November 25, 2014 Michael Berger, an attorney at MSH, served an affirmation in opposition to Ms. Santos' OSC, returnable December 1, 2014. In his affirmation in opposition, Berger relied upon Lamb's false affidavit of service ("defendant's general allegations are insufficient to rebut the presumption of good service").  In opposing the OSC, MSH and Pinpoint relied on the false affidavit of service.  Tellingly, Berger did not include the Fabacher affidavit of merit even though MSH attached the other documents from the state court case, as well as prior putative letters.  On information and belief, MSH did not attache the Fabacher affidavit to the opposition to the November 11, 2014 *pro se* OSC in order to attempt to conceal from Ms. Santos and the court a possible basis for vacating the default judgment: namely, that the judgment was entered based on Fabacher's false affidavit of merit. Further, Berger contended MSH sent Ms. Santos post-judgment collection letters, but did not disclose that the address to which they were mailed was incorrect, or state whether any of the letters were returned as undeliverable, or whether MSH even tracks undeliverable collection letters. Berger also contended MSH spoke with Ms. Santos in 2005 but conveniently does not state that MSH was attempting to collect on the putative judgment, the key issue.

40.     Further, at the time that Berger relied upon Lamb's false affidavit of service, Berger and MSH had ample notice that Lamb was an unreliable process server. Most obviously, MSH and its principals knew of the high likelihood that the Lamb affidavit of service was false, as was the Fabacher affidavit of merit because Lamb and Fabacher were all sued in a class action alleging the same. MSH and its principals in the *Sykes* class action obviously knew of the information of

massive sewer service, including the 2011 Egleson declaration.   Despite all of this, on information and belief MSH took no steps to determine the validity of the Lamb affidavit of service, by, for example, checking MSH's database of process service by Mr. Lamb that day.

41.    For the reasons stated in the above two paragraphs, the November 25, 2014 Berger opposition to the November 13, 2014 *pro se* OSC is therefore itself separate conduct that is unconscionable, as well as false, deceptive, and misleading for the reasons stated in this paragraph, and for the same reasons previously outlined as to the October 20, 2014 Execution by Waldman.

42.    On or about December 11, 2014, Ms. Santos filed a response to MSH's affirmation in opposition, stating: that she never lived at the address where service was alleged; and that her ID and Social Security were stolen from her work place in 2002-2003.

43.    On February 5, 2015, the court denied Ms. Santos' OSC, stating that she was "unable to rebut the statements in the affidavit of service". In addition, the court found that Ms. Santos did not present a reasonable excuse for her failure to appear and a meritorious defense.

44.    MSH then removed money from Ms. Santos' Chase account. MSH contended in subsequent filings that on or around 2/19/2015, MSH posted $1,992.80 to this account pursuant to the JP Morgan bank levy that was issued to the enforcement officer on 10/20/2014 prior to the time MSH received defendant's first OSC." The marshal took out additional fees for itself and, as previously stated, the bank already had taken its $75 processing fee. MSH's clearing out of Ms. Santos' bank account is itself separate conduct that is unconscionable, as well as false, deceptive, and misleading for the reasons stated *supra* in paragraphs 20,31, 32, and 40. Further, the entry of default judgment based on the fraud of Defendants and the clearing out of Ms. Santos' bank account constitutes further conversion of Ms. Santos' money.

45.     On or about March 5, 2015, Ms. Santos filed as *pro se* OSC and an affidavit in support of an OSC for leave to renew and reargue her OSC to vacate the underlying default judgment. Importantly, Ms. Santos had a copy of the affidavit of service that was attached to the Berger Affirmation in opposition to her prior pro se OSC, and was now able to challenge the specific assertions by the process server.

46.     To assist her with her second *pro se* OSC, Ms. Santos went to the CLARO clinic, where volunteer attorneys and law students attempt to triage within 2 or 3 hours what often can be a deluge number of pro se consumers seeking advice or assistance in defending consumer credit cases. As previously stated, Ms. Santos is a native Spanish speaker, with knowledge of written English that is limited. She also has some limitations on her ability to clearly speak English. It was during one of the CLARO clinics that Ms. Santos executed a lengthy, detailed Affidavit in Support of Order to Show Cause Pursuant to CPLR 2222(1).  The affidavit was 6 pages in length with 37 paragraphs of very detailed facts, including facts as to dates of residence going back nearly twenty years. In retrospect, when reviewed closely in an environment other than a crowded volunteer legal clinic, a detail or two may have been misstated. For example, the apartment number 4M was transposed with 6M.  Aside from a few details, the main points of the affidavit are entirely correct: Ms. Santos never received notice of the judgment until October or November 2014; she had not resided at the address of service for some seven years prior to putative service; the putative post-judgment letters sent by Defendants were sent to addresses other than where she lived; and she had not received those letters.

47.     In subsequent correspondence to MSH and in subsequent filings with the court Ms. Santos produced irrefutable documentary evidence of her actual address, including DMV records, and housing records from the New York State Division of Housing and Community

Case 1:15-cv-07795-AT  Document 1  Filed 10/01/15  Page 14 of 24

Renewal. These records clearly demonstrated that, as she stated in her affidavit, she did not live – and had not for years lived – at the address of putative service or the address where the alleged post-judgment collection letters were sent.

48.     On March 6, 2015, Hon. Eddie J. McShan, finding merit to the application, granted the second *pro se* OSC, enjoined further collection attempts, and set a hearing for March 23, 2015 on Ms. Santos' OSC to Renew and Reargue.

49.     On March 23, 2015, Hon. Paul L. Alpert issued an order adjourning Ms. Santos' OSC to Renew and Reargue.

50.     MSH continued to vociferously oppose the vacating of the fraudulent default judgment. On or about April 14, 2015 Defendant Waldman signed an Affirmation in Opposition to Ms. Santos' Motion to Renew and Reargue. In the Affirmation in Opposition Waldman even attached Ms. Santos' documentary evidence of her address, including the DMV and housing department records. Despite this evidence, Waldman continued to insist that the address in the Lamb affidavit of service and the subsequent collection letters were correct. Waldman attached no fewer than twelve exhibits opposing the OSC to Renew. Tellingly, MSH, through Waldman, conveniently omitted the Fabacher affidavit of merit. For the same reasons stated *supra* in paragraphs 44, 41, 32, 31 and 20, Waldman's Opposition to Santos' *pro se* OSC to Renew was separate conduct that is unconscionable, as well as false, deceptive, and misleading.

51.     On or about April 20, 2015, Ms. Santos filed her Reply to Plaintiff's Affirmation In Opposition. At this point, Ms. Santos was fortunate enough to be represented by a legal services attorney, Lauren Elfant of the Urban Justice Center. Ms. Elfant filed the Reply making legal arguments.

52.     On June 4, 2015, Hon. Paul L. Alpert, issued an order granting renewal of Ms. Santos'

OSC to vacate the default judgment given that Ms. Santos did not have access to the affidavit of service in order to make a specific affidavit in support of her OSC. *Pinpoint Technologies LLC v. Santos*, 2015 WL 3749910 (N.Y.City Civ.Ct.).  Judge Alpert granted the motion to Renew because Ms. Santos, was now able to set forth news facts that were not present in her prior application. "Most importantly, the defendant has now had an opportunity to review the affidavit of service and indicates that at the time service was allegedly made she did not reside at the premises where the process server indicates process was served." *Id*.  The court set the matter down for a traverse hearing on October 30, 2015.

53.    Ms. Santos was eventually able to get the putative affidavit of service from the Berger opposition to the original OSC.  The court file was offsite.  Indeed, despite being requested many months ago, it was only a few days ago that the clerk indicated the file had been received from archives. It is only upon inspecting the file earlier this week that Ms. Santos' counsel were able to see the Fabacher affidavit of merit and the signed summons and complaint.  While MSH attached a plethora of documents in its various OSC oppositions, it always omitted the Fabacher affidavit of merit (the disclosure of which would provide the consumer a possible defense to the judgment) and the signed summons and complaint.

54.    To this day, MSH and Pinpoint still have the money they garnished from Ms. Santos, and the marshal still has his fees from the execution.

55.    MSH and Pinpoint will not agree to repeated requests to vacate the judgment and return the money without Ms. Santos waiving potential claims against MSH and Pinpoint. This is an unconscionable demand.  Defendants: 1) sued Ms. Santos for a debt she did not owe; 2) obtained a default judgment based on a false affidavit of service and merit ( an affidavit similar to those systematically used to obtain fraudulent judgments against over 100,000 other New York

consumers); 3) executed on the known fraudulent judgment; 4) repeatedly fought tooth and nail to prevent Ms. Santos from being able to vacate the fraudulent default; 5) cleared out her bank account after she lost her original *pro se* OSC because she did not have the affidavit of service to challenge; 6) and have held (converted) her money for more than 7 months.  After doing all that, Defendants will only return Ms. Santos' money if she agrees not to attempt to hold Defendants accountable for their outrageous conduct. That is unconscionable, and false, deceptive, and misleading.

56.     Ms. Santos suffered damages as a result of Defendants' conduct. Defendants have still not returned the money that was taken from Ms. Santos' Chase account. Defendants' conduct caused Ms. Santos to endure significant emotional distress. Ms. Santos was scared and stressed, not understanding why this was happening to her. She did not understand how or why Defendants were able to do what they were doing. She was afraid Defendants would take all of the rest of her money. She was especially afraid when the MSH told her on the phone that they could hold *all* of the money in her account if she did not sign a release, which was not true. She was scared and worried, constantly thinking about what the Defendants were doing to her, and she would break down crying.  She was so stressed and scared she would stay up at all hours, unable to sleep for months, and having to take pills to help her sleep.  She took pills to help her sleep for abo9ut 6 months. She was fixated on this, and thought about it every day. Ms. Santos felt like someone had stolen her money, making her feel unsafe and vulnerable. Ms. Santos felt that, if the Defendants can once take money from her for a suit she had no knowledge of, that maybe they or someone else will do so again. She began feeling withdrawn, started wanting to be holed up at home. The stress affected Ms. Santos' concentration at work, where she worked long hours as a long-haul bus driver, and she missed days of work.  Ms. Santos incurred expenses of

time and money traveling to and from court defending the collections lawsuit and attempting to vacate the fraudulently obtained judgment. Ms. Santos spent time and expended money to get documents to document her address for a period of nearly twenty years. Ms. Santos needs the money that Defendants have wrongfully taken in order to pay essential bills such are rent, and is afraid of what will happen next. Ms. Santos became particularly afraid of falling behind on bills and incurring debt. Ms. Santos often felt depressed, which affected her desire to socialize, causing problems with her own sister and friends. She felt like she was re-living a previous experience when she was a victim of identity theft.

57.     The traverse hearing is set for October 30, 2015.

### D.     COUNT # 1: VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

58.     Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

59.     The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e); see also *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

60.     Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general."  *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been

subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

61.    The obligation alleged to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative credit card debt was incurred primarily for family, personal or household purposes.

62.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

63.    Defendants are each a "debt collector" as defined in 15 U.S.C. § 1692a(6) because their principal purpose is the collection of debts and/or they regularly attempt to collect debts, directly or indirectly.

64.    Pinpoint is a "debt collector" because it purchases charged off consumer accounts after they are in default with the putative original creditor and attempts to collect on them by sending thousands of collection letters and filing thousands of collections lawsuits.

65.    MSH is a law-firm in the business of collecting debts because it attempts to collect alleged debts owned by others by filing thousands of collections lawsuit, by sending out thousands of collection letters, and by making thousands of debt collection telephone calls.

66.    Harris is a "debt collector" because he attempts to collect alleged debts owned by others by (purporting to) sign thousands of collection lawsuits, thousands of debt collection pleadings, thousands post-judgment collection mechanisms (e.g. information subpoenas), and thousands of collection letters. Harris is the primary shareholder of MSH, and is the named partner.

67.     Waldman is a "debt collector" because he attempts to collect alleged debts owned by others by (purporting to) sign thousands of collection lawsuits, thousands of debt collection pleadings, and thousands post-judgment collection mechanisms (e.g. executions). Waldman is a shareholder of and partner in MSH.

68.     Lutz is a "debt collector" because she attempts to collect alleged debts owned by others by (purporting to) sign thousands of collection lawsuits, thousands of debt collection pleadings (such as applications for default judgment), and thousands post-judgment collection mechanisms (e.g. executions). Lutz was, for the period of the entry of the default judgment and for a period thereafter, a shareholder of and partner in MSH.

69.     Fabacher is a "debt collector" because he attempts to collect, directly or indirectly, alleged debts owned by others by signing hundreds of thousands of affidavits of merit that falsely content personal knowledge as to the key facts to allow the entry fraudulent entry of default judgments against consumers, including Ms. Santos. Fabacher is also a debt collector because at the " director of information technology" for MSH, Fabacher collected debts directly and indirectly by creating the MSH system that directed debt collection practice for MSH, including how and when to file suit, issue executions, or issue collection letters.

70.     Based in part on the findings of fact by the district court in the order certifying class certification in *Sykes*, Harris, Waldman, and Fabacher, on information and belief, were key actors in creating, implementing, and maintaining the common scheme against consumers such as Ms. Santos by allowing false affidavits of service and false affidavits of merit to be used to systematically enter default judgments against consumers.  As succinctly stated by the district court:

> Plaintiffs do not merely allege that the Leucadia and Mel Harris defendants "lack physical evidence of the debt," but that they knowingly authorized defendant Fabacher to

> file false affidavits of merit—misleading both the Civil Court and consumer-defendants—to secure default judgments that enabled them to freeze bank accounts, threaten to garnish wages, or pressure individuals into settlements.

*Sykes I*, at 424

For these reasons and others, Harris, Waldman, Lutz, and Fabacher are jointly and severally liable for the liability of MSH as to Ms. Santos.

71.    Defendants materially violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e, and 1692f.  For the reasons stated in the Statement of Facts, Defendants violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; the false representation or implication that any individual is an attorney or that any communication is from an attorney; threatening to take and actually taking an action prohibited by law; communicating or threatening to communicate to any person credit information which is known or which should be known to be false; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

## E.    NEW YORK GENERAL BUSINESS LAW SECTION 349 ET SEQ.

72.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

73.    New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state…"

74.     An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. Law § 349(h).

75.     As enumerated in the Statement of Facts above, Defendants violated N.Y. Gen. Bus. Law § 349 et seq. by using deceptive acts and practices in the conduct of their businesses.

76.     Defendants' conduct has a broad impact on consumers at large. Defendants' conduct impacts thousands of consumers New York who have been victims of "sewer service," who have default judgments rendered against them by the use of false affidavits of service and false affidavits of merit, that have had their accounts garnished based on the collection of fraudulently entered default judgments.

77.     Defendants committed the above described acts willfully and/or knowingly.

78.     Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

79.     As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 *et seq*, Plaintiff suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble and punitive damages, and costs and attorney's fees.

## F.     CONVERSION

80.     Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

81.     The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

82.     Defendants obtained the default judgment against Ms. Santos based on their own conduct in fraudulently obtaining a default judgment. Therefore, Defendants are liable for conversion for

their restraints upon, execution on, and retention of the Ms. Santos' money.

83.     Property subject to conversion includes, *inter alia*, readily identifiable funds from a bank account.

84.     Defendants intentionally and without authority, assumed and exercised control over the funds in Ms. Santos' bank account, Plaintiff's money, interfering with her right to possession of the same, *by inter alia*: issuing a restraint on her bank account and withdrawing funds pursuant to a judgment that was not valid because of their own wrongful conduct in obtaining the default judgment; and directing a Marshal to seize the money from the bank and charge fees for levying despite the Defendants having received notice that the judgment was improperly obtained.

85.     Defendants' improper restraint of Plaintiff's money without qualification, which harmfully interfered with Plaintiff's rights to control his own property, constitutes conversion.

86.     For the reasons stated in the above Statement of Facts, the conduct of the Defendants is gross, wanton or deliberate and demonstrates a high degree of moral culpability. Further, said Defendants conduct as alleged in the statement of facts demonstrates malice, insult, and/or willful or reckless disregard of Plaintiff's rights, or other aggravated acts by said Defendants.

87.     For these reasons, Plaintiff is entitled to punitive damages, in addition to actual damages.

## G.     NEW YORK JUDICIARY LAW § 487

### (against attorney Defendants MSH, Harris, Waldman, and Lutz)

88.     New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "wilfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

89.     Defendants MSH, Harris, Waldman, and Lutz (the "attorney Defendants") Defendants violated § 487 by, *inter alia*, using false affidavits of service and false affidavits of merit to obtain default judgments against Ms. Santos; and to use the fraudulently obtained judgments to execute on Ms. Santos' bank, to vociferously oppose Ms. Santos' attempt to vacate the fraudulently obtained judgment, and to refuse to release the (essentially) stolen money unless Ms. Santos agreed to release all Defendants from their fraud to inflicted and continues to inflect damages on Ms. Santos.

90.     The violations of § 487 by Defendant inflicted damages, for the reasons and in the manner stated in the above Statement of Facts.

91.     Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487 by Defendant and Plaintiff so seeks.

### **H.     JURY DEMAND.**

92.     Plaintiff demands a trial by jury.

### **I.     PRAYER**

93.     WHEREFORE, Plaintiff requests the following relief:

   a.     A declaration that all Defendants have committed the violations of law alleged in this action;

   b.     An order enjoining and directing all Defendants to cease violating G.B.L. § 349 *et seq.*;

   c.     Statutory damages under 15 U.S.C. § 1692k and GBL 349;

   d.     An order awarding disbursements, costs, and attorneys' fees under 15 U.S.C. § 1692k and G.B.L. § 349;

   e.     A judgment for actual, treble, statutory, punitive, and exemplary damages;

   f.     Prejudgment and post judgment interest as allowed by law;

   g.     All other relief, in law and in equity, both special and general, to which Plaintiff may be

justly entitled.

Dated:  Brooklyn, New York
        October 1, 2015

                                      Respectfully submitted,

                                      /s/

                                      Ahmad Keshavarz
                                      The Law Office of Ahmad Keshavarz
                                      16 Court St., 26th Floor
                                      Brooklyn, NY 11241-1026
                                      Phone: (718) 522-7900
                                      Fax:    (877) 496-7809
                                      Email: ahmad@NewYorkConsumerAttorney.com